# In the United States Court of Federal Claims

No. 13-413 L
Filed: April 29, 2014
**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| \* | Administrative Procedure Act, |
| \* |    5 U.S.C. § 551 *et seq*.; |
| \* | Arizona Wilderness Act of 1984, Pub. L. 98- |
| \* |    406, 98 Stat. 1485 (as amended); |
| \* | Federal Land Policy and Management Act of |
| \* |    1976, 43 U.S.C. § 1701 *et seq*.; |
| \* | Mining Law of 1872, 30 U.S.C. §§ 22–47; |
| \* | National Environmental Policy Act of 1969, |
| \* |    42 U.S.C. § 4321 *et seq*.; |
| \* | Surface Mining Control and Reclamation |
| \* |    Act of 1977, 30 U.S.C. §§ 1201–1328 |
| \* |    (governing surface coal mining |
| \* |    operations); |
| \* | Ripeness; |
| \* | 36 C.F.R. § 228.4(c) (plan of operations for |
| \* |    mining on Forest Service lands); |
| \* | 36 C.F.R. § 228.5(a)(1)–(5) (approving a |
| \* |    plan of operations for mining on Forest |
| \* |    Service lands); |
| \* | 43 C.F.R. § 3809.100(a) (provisions |
| \* |    applicable to segregated or withdrawn |
| \* |    lands); |
| \* | 43 C.F.R. § 3809.401(b) (requirements for |
| \* |    plan of operations on BLM lands); |
| \* | 43 C.F.R. § 3832.11(c)(1) (locating mining |
| \* |    claims); |
| \* | RCFC 12(b)(1) (jurisdiction); |
| \* | RCFC 12(b)(6) (failure to state a claim). |

VANE MINERALS (US), LLC,

    Plaintiff,

v.

THE UNITED STATES,

    Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**John C. Lacy,** DeConcini McDonald Yetwin & Lacy, P.C., Tucson, Arizona, Counsel for Plaintiff.

**Gregory Daniel Page,** United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN,** *Judge.*

## I.    FACTUAL BACKGROUND.[1]

VANE Minerals (US), LLC ("Plaintiff"), a Delaware limited liability company, has been in the business of locating and exploring mineral properties in Northern Arizona since 1979. Compl. ¶¶ 5, 10; 1/2/13 Hefton Decl. ¶ 2.  Since October 2004, Plaintiff primarily has focused on uranium exploration and mining, and has invested more than $8.5 million in uranium mining exploration.  Compl. ¶¶ 5, 8, 11; 1/2/13 Hefton Decl. ¶ 1.

As of June 21, 2013, Plaintiff held 678 unpatented lode mining claims on two areas of federal land in Northern Arizona.  Compl. ¶¶ 1, 7–10.  The first area, known as the "Arizona Strip," includes 626,678 acres.  1/2/13 Hefton Decl. ¶ 10.  The second area includes 355,874 acres in the Kaibab National Forest.  1/2/13 Hefton Decl. ¶ 10.  Plaintiff asserted these claims, pursuant to the Mining Law of 1872, 30 U.S.C. §§ 22–47, that "authorizes citizens to stake, or 'locate,' a valid mining claim upon 'discovery' of a valuable mineral deposit on public lands." *Copar Pumice Co., Inc. v. United States*, 112 Fed. Cl. 515, 520 (2013) (internal citations omitted).  The claims include "commercially viable concentrations of uranium [that] are located within geological features known as breccia pipes,"[2] and are "among the highest grade in the world."  1/2/13 Hefton Decl. ¶¶ 3–5.  Mining uranium from breccia pipes occurs underground; the ore is then transported for processing.  1/2/13 Hefton Decl. ¶ 6.

On July 21, 2009, the United States Department of the Interior ("Interior"), acting through the Bureau of Land Management ("BLM"), published a Notice of Proposed Withdrawal of "approximately 633,547 acres of public lands and 360,002 acres of National Forest System lands for up to 20 years from location and entry under the Mining Law of 1872[.]"  Notice of Proposed Withdrawal and Opportunity for Public Meeting; Arizona, 74 FED. REG. 35,887-01 (July 21, 2009) (the "Withdrawal Notice"); *see also* 1/2/13 Hefton Decl. ¶ 10.  The Withdrawal Notice further segregated the aforementioned lands ("Withdrawal Area") from location and entry under the Mining Law of 1872 for a period of two years to "protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining," and to allow "studies and analyses, including appropriate National Environmental Policy Act analysis." Withdrawal Notice, 74 FED. REG. at 35,887.  If approved by the Secretary of the Interior, Interior

---

[1]  The relevant facts cited herein were derived from: the June 21, 2013 Complaint ("Compl."); the August 5, 2013 Declaration of Rody Cox ("8/5/13 Cox Decl.") and August 8, 2013 Declaration of Elizabeth Schuppert ("8/8/13 Schuppert Decl."), including attached exhibits ("Schuppert Decl. Exs. A–G"); the Government's August 20, 2013 Motion To Dismiss; and the January 2, 2013 Declaration of Kris Hefton ("1/2/13 Hefton Decl."), attached as an exhibit to Plaintiff's September 20, 2013 Response to the Government's August 20, 2013 Motion.

[2]  Breccia pipes are vertical columns of broken rock that have collapsed downward into underground caverns, typically spanning 300 feet in diameter and extending vertically underground for approximately 2,000 to 3,000 feet.  1/2/3 Hefton Decl. ¶ 3.

was authorized to withdraw the lands within the Withdrawal Area "subject to valid existing rights." *Id.* All of Plaintiff's unpatented lode mining claims are located within the Withdrawal Area. 1/2/13 Hefton Decl. ¶ 10.

On August 20, 2009, the United States Forest Service ("Forest Service") met with all interested uranium exploration and mining companies within the Withdrawal Area to discuss the proposed mineral examination process that would be used to determine whether mining claimants within the Withdrawal Area had valid existing rights that would be exempt from the effects of the Withdrawal Notice. 8/8/13 Schuppert Decl. ¶¶ 5–9. At some unidentified time thereafter, Plaintiff submitted a plan of operations to the Forest Service. 8/8/13 Schuppert Decl. ¶ 9. On April 8, 2010, the Forest Service informed Plaintiff, in a letter addressed to Mr. Hefton, of the steps necessary to obtain a valid existing rights determination and scheduled a field examination for May 3, 2010. 8/8/13 Schuppert Decl. Ex. A. On May 7, 2010, Mr. Hefton participated in a teleconference with various representatives from the Forest Service, during which Mr. Hefton inquired about the consequences if Plaintiff withdrew its pending plan of operations. 8/8/13 Schuppert Decl. Ex. C at 2. That same day, Mark Schwab, a Forest Service Mineral Examiner, informed Mr. Hefton via email that if "the [p]lan of [o]perations is withdrawn, there would be no need to conduct [a valid existing rights] determination of the subject mining claims, and the [valid existing rights] examination would not occur." 8/8/13 Schuppert Decl. Ex. C at 2. Later that day, Mr. Hefton withdrew Plaintiff's proposed, submitted plan of operations and all other plans of operation "on all of [Plaintiff's] projects in the Kaibab National Forest[.]" 8/8/13 Schuppert Decl. Ex. C at 1.

On June 21, 2011, close to the expiration of the two-year Withdrawal Notice, Interior issued an "emergency six month withdrawal order of the subject Federal lands," pursuant to the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq.* ("FLPMA"). Compl. ¶ 35.

On January 18, 2012, Interior "withdr[ew] approximately 1,006,545 acres of public and National Forest System lands from location and entry under the Mining Law of 1872 . . . , subject to valid existing rights, for a period of 20 years in order to protect the Grand Canyon Watershed from adverse effects of locatable mineral exploration and development." Public Land Order No. 7787; Withdrawal of Public and National Forest System Lands in the Grand Canyon Watershed; Arizona, 77 FED. REG. 2,563-01 (Jan. 18, 2012) (the "Withdrawal Order")). The Withdrawal Order became effective on January 21, 2012. *Id.*

## II.   PROCEDURAL HISTORY.

On September 27, 2012, Plaintiff filed a Complaint in the United States Court of Federal Claims, alleging that the Withdrawal Order violated: the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"); FLPMA; the Arizona Wilderness Act of 1984, Pub. L. 98-406, 98 Stat. 1485 ("AWA"), and regulations adopted to implement each of these statutes. Complaint, *Vane Minerals v. United States*, No. 12-cv-646 (Fed. Cl. Sept. 27, 2012), ECF No. 1. The September 27, 2012 Complaint sought damages under two theories: inverse condemnation and estoppel. *Id.*

On November 26, 2012, the Government filed a Motion To Dismiss, pursuant to RCFC 12(b)(1), arguing that the court did not have jurisdiction to adjudicate the claims alleged in the September 27, 2012 Complaint, because Plaintiff previously filed Complaints-In-Intervention on June 4, 2012 and June 27, 2012 in the United States District Court for the District of Arizona in cases that arose from the same set of operative facts as the suit in the United States Court of Federal Claims.

On December 26, 2012, Plaintiff filed a Notice in the United States District Court for the District of Arizona requesting that the June 4, 2012 and June 27, 2012 Complaints-In-Intervention be dismissed, without prejudice. *See Yount v. Salazar*, No. 3:11-cv-8171 (D. Ariz. Dec. 26, 2012), ECF No. 86. On January 8, 2013, the United States District Court for the District of Arizona dismissed Plaintiff's Complaints, without prejudice. *See Yount v. Salazar*, No. 3:11-cv-8171 (D. Ariz. Jan. 8, 2013), ECF No. 87.

On January 2, 2013, Plaintiff filed a Response to the Government's November 26, 2012 Motion To Dismiss. On January 22, 2013, the Government filed a Reply.

On May 29, 2013, the United States Court of Federal Claims issued a Memorandum Opinion And Final Order, determining "that 28 U.S.C. § 1500 divests the court of jurisdiction . . . , because at the time of the filing of the September 27, 2012 Complaint in the United States Court of Federal Claims, Plaintiff was a party to two prior related cases in the United States District Court for the District of Arizona, arising from the same set of operative facts." *See Vane Minerals (US), LLC v. United States*, 111 Fed. Cl. 253, 255–56 (2013) ("*Vane I*").

On June 21, 2013, Plaintiff filed a second Complaint in the United States Court of Federal Claims that is almost identical to that dismissed on May 29, 2013 in *Vane I*.

The Complaint alleges that, within the Withdrawal Area, 3,350 mining claims are located, including 678 of Plaintiff's unpatented lode mining claims constituting 20.2% of that total and an "estimated undiscovered uranium endowment of 12,250 tons of uranium oxide." Compl. ¶ 57(a)–(c). Approximately 1,837 tons of uranium oxide underlying Plaintiff's claims is commercially feasible to mine, representing a projected net value to Plaintiff (after deducting projected development expenses) of "between $68,550,000 and $123,615,000." Compl. ¶¶ 57(d)–58. To date, the BLM and Forest Service have refused to allow Plaintiff to explore its mining claims or locate additional claims. Compl. ¶ 60. In particular, the Complaint alleges that the Withdrawal Notice effectively prevented Plaintiff from engaging in mining operations until the BLM prepared a mineral examination report, confirming that Plaintiff had made a "mineral discovery." 1/2/13 Hefton Decl. ¶ 11 (citing 43 C.F.R. § 3809.100[3]); *see also* Pl. Resp. 6 ("Had

---

[3] This regulation, first promulgated as a Final Rule on November 21, 2000, provides, in relevant part, that:

> After the date on which the lands are withdrawn from appropriation under the mining laws, BLM will not approve a plan of operations or allow notice-level operations to proceed until BLM has prepared a mineral examination report to determine whether the mining claim was valid before the withdrawal, and whether

the [Withdrawal Notice], and later the [W]ithdrawal [Order], not been in effect, the Forest Service would not have required mineral examinations or demonstrations of mineral discoveries as a condition of approving [Plaintiff's] plan of operations.").

The June 21, 2013 Complaint alleges two causes of action: "Inverse Condemnation" (Count I) and "Estoppel" (Count II).  Insofar as Count I is concerned, the June 21, 2013 Complaint alleges that, as a result of the Withdrawal Order, Plaintiff has been "deprived all economic and other benefits of its property interests in the 678 lode mining claims located within [the Withdrawal Area]." Compl. ¶ 62.  Count II is referred to, in the alternative, as a claim for "estoppel" (Compl. 18), "promissory estoppel" (Compl. ¶ 3), and/or "equitabl[e] estoppe[l]." Compl. ¶ 69.  In particular, Count II alleges that Plaintiff: (1) "suffered as a result of [Plaintiff's] reliance upon longstanding congressional and administrative representations that the [Withdrawal Area] would remain open for mining" (Compl. 19); (2) is entitled to "exploration costs under the concept of promissory estoppel" (Compl. ¶ 3); and/or (3) is entitled to damages, because the Government is "equitably estopped from enforcing the [Withdrawal Order] such that, if the [Withdrawal Order] is not reversed, [Plaintiff] is entitled to damages equal to the amounts it spent on its mineral exploration program" (Compl. ¶ 70).

The June 21, 2013 Complaint seeks $68,550,000 in compensation for the Government's "taking" of Plaintiff's 678 unpatented lode mining claims, and $8,500,000 to reimburse Plaintiff for expenditures made in reliance on the uranium exploration program. Compl. 19.

On August 20, 2013, the Government filed a Motion To Dismiss ("Gov't Mot."), pursuant to RCFC 12(b)(1) and 12(b)(6), together with: (1) the 8/5/13 Declaration of Rody Cox, a geologist in the BLM Arizona Strip Field Office; and (2) the 8/8/13 Declaration of Elizabeth Schuppert, a Forest Service Forester, employed in the Kaibab National Forest.

On September 20, 2013, Plaintiff filed a Response ("Pl. Resp."), together with: (1) the 1/2/13 Declaration of Kris Hefton, Plaintiff's Chief Operating Officer; (2) a copy of a United States District Court for the District of Arizona's Opinion And Order denying in part, and granting in part, the Government's Motion To Dismiss in *Yount v. Salazar* (*Yount v. Salazar*, No. 3:11-cv-8171 (D. Ariz. Jan. 8, 2013), ECF No. 87); and (3) an excerpt of the Northern Arizona Proposed Withdrawal Final Environmental Impact Statement.

On November 8, 2013, the Government filed a Reply ("Gov't Reply").

---

it remains valid. BLM may require preparation of a mineral examination report before approving a plan of operations or allowing notice-level operations to proceed on segregated lands. If the report concludes that the mining claim is invalid, BLM will not approve operations or allow notice-level operations on the mining claim. BLM will also promptly initiate contest proceedings.

43 C.F.R. § 3809.100(a); *see also* Mining Claims Under the General Mining Laws; Surface Management, 65 FED. REG. 69,998-01, 70,025 (Nov. 21, 2000) (promulgating Final Rule).

### III.    DISCUSSION.

#### A.    Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).  The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists."  *United States v. Testan*, 424 U.S. 392, 398 (1976).

Therefore, to pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages.  *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act itself."); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act . . . does not create a substantive cause of action; . . . a plaintiff must identify a separate source of substantive law that creates the right to money damages . . . . [T]hat source must be 'money-mandating.'").  Specifically, a plaintiff must demonstrate that the source of substantive law upon which he relies "can fairly be interpreted as mandating compensation by the Federal Government."  *United States v. Mitchell*, 463 U.S. 206, 216 (1983) (quoting *Testan*, 424 U.S. at 400).  And, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question . . . . [the plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").

#### B.    Standard Of Review For A Motion To Dismiss Pursuant To RCFC 12(b)(1).

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion[.]" *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required.  But a party may assert the following defenses by motion: (1) lack of subject-matter jurisdiction[.]").  When considering whether to dismiss an action for lack of subject matter jurisdiction, the court generally is "obligated to assume all factual allegations of the complaint to be true and to draw all reasonable inferences in plaintiff's favor."  *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

#### C.    Standard Of Review For A Motion To Dismiss Pursuant To RCFC 12(b)(6).

A challenge to the United States Court of Federal Claims' "[ability] to exercise its general power with regard to the facts peculiar to the specific claim . . . is raised by a [Rule]

12(b)(6) motion[.]"  *Palmer*, 168 F.3d at 1313; *see also* RCFC 12(b)(6) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading . . . . [b]ut a party may assert the following defenses by motion: . . . (6) failure to state a claim upon which relief can be granted[.]").

When considering whether to dismiss an action for failure to state a claim, the court "must assess whether the complaint adequately states a claim and whether plaintiffs can allege facts plausibly suggesting (not merely consistent with) a showing of entitlement to relief." *Hutchens v. United States*, 89 Fed. Cl. 553, 562 (2009) (internal citations omitted).  A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The plaintiff's factual allegations must be substantial enough to raise the right to relief "above the speculative level," accepting all factual allegations in the complaint as true and "indulg[ing] all reasonable inferences in favor of the non-movant."  *Hutchens*, 89 Fed. Cl. at 562 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

### D.    Applicable Statutory And Regulatory Framework.

Plaintiff's 678 unpatented mining claims, located on Forest Service and BLM lands, are governed by the Mining Law of 1872 that "encourages citizens to locate valuable mineral deposits on public land owned by the federal [G]overnment," *Grover v. United States*, 73 Fed. App'x 401, 402 (Fed. Cir. 2003), and authorizes American citizens to "locate" valid mining claims after "discovery" of valuable mineral deposits and compliance with applicable legal requirements.   *Chrisman v. Miller*, 197 U.S. 313, 322–23 (1905); *see also United States v. Coleman*, 390 U.S. 599, 602 (1968) (recognizing that Congress enacted the Mining Law of 1872 so that the certain public lands would be "available to people for the purpose of mining valuable mineral deposits").  The discovery of a valid mining claim occurs when the claimant demonstrates that a reasonably prudent person would be justified in expending effort to further develop the claim.  *See Best v. Humboldt Placer Min. Co.*, 371 U.S. 334, 335–36 (1963) ("[The] discovery must be of such a character that 'a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine.'" (quoting *Castle v. Womble*, 19 Pub. Lands Dec. 455, 457 (1894)[4])); *see also* ROCKY MTN. MIN. L. FOUND, 2 AMERICAN LAW OF MINING, § 30.5, 30-15 (2013) ("Discovery of a valuable mineral deposit is the *sine qua non* of a valid mining claim.").

---

[4] The Mining Law of 1872 requires a claimant to make a "discovery of the vein or lode within the limits of the claim located," but "discovery" is not statutorily defined.  30 U.S.C. § 23. In *Castle v. Womble*, Interior promulgated a rule for the first time, in a Reporter entitled Decisions Relating To The Public Lands ("Pub. Lands Dec."), that a "discovery" occurred within the meaning of the Mining Law of 1872 when "mineral is found, and the evidence shows that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine."  *Castle*, 19 Pub. Lands Dec. at 457.  The United States Supreme Court "has approved the prudent-man formulation and interpretation on numerous occasions," interpreting the term "discovery" in the same manner that "the Secretary [of the Interior] has been using to interpret the mining laws since 1894." *Coleman*, 390 U.S. at 602.

A mining claimant also must establish that "the mineral can be extracted, removed, and marketed at a profit."  *Coleman*, 390 U.S. at 600 (internal citations and quotations omitted).

Congress, however, subsequently enacted Section 204(c) of FLPMA, that authorizes the Secretary of the Interior to withdraw lands of five thousand acres or more from location and entry under the Mining Law, "for a period of not more than twenty years."  43 U.S.C. § 1714(c)(1).  That authority includes lands managed by the BLM as well as the Forest Service.  *See* 43 U.S.C. 1702(j) (providing that a "withdrawal" applies to "federal Land"); *see also id.* § 1714(i) (authorizing the Secretary of the Interior to withdraw lands under the administration of another department or agency "with the consent of the head of the department or agency concerned").

The Mining Law of 1872 recognizes two types of property rights in mining claims: unpatented and patented.  *See Best*, 371 U.S. at 335–36 (describing the difference between unpatented and patented mining claims).  An unpatented mining claim vests in a claimant upon the discovery of a valuable mineral deposit and compliance with applicable regulations.  *Id.* at 336.  A claimant with an unpatented mining claim "enjoys an exclusive possessory right in the surface land and the underlying mineral deposits, [but] the United States retains fee title in the land."  *Grover*, 73 Fed. App'x at 402 (internal quotations omitted); *see also Best*, 371 U.S. at 335–36 (describing unpatented mining claims as "a possessory interest in land that is 'mineral in character' . . . . [but where] the title to the lands in controversy still [belongs to] the United States").  Provided a recognized discovery is made, unpatented mining claims also are "fully recognized possessory interests."  *United States v. Locke*, 471 U.S. 84, 104 (1985) (holding that unpatented mining claims are protected property rights, but that the Government, "as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired").

The Mining Law of 1872 also authorizes a claimant with unpatented mining claims to apply for a mineral patent and thereby obtain title to the land in fee simple from the Government.[5]  *See* 30 U.S.C. § 29 (describing the procedure for obtaining a "patent for any land claimed and located for valuable deposits"); *see also* ROCKY MTN. MIN. L. FOUND, 2 AMERICAN LAW OF MINING, § 30.06, 30-21 (2013) ("There is no requirement to apply for [a] patent, and a locator may mine and extract all mineral from his claim without ever making payment to the United States.  Nevertheless, the possessory rights of a locator are not fully secure until he obtains full legal title by patent.").  To obtain a patent, a mining claimant must submit an application to the BLM, which will then survey the claims and adjudicate the application to verify that a discovery of a valuable mineral has been made.  *See* ROCKY MTN. MIN. L. FOUND, 2 AMERICAN LAW OF MINING, § 30.06, 30-21 (2013).

---

[5] But, since October 1, 1994, Congress annually has renewed a moratorium on BLM's acceptance of new mineral patent applications.  *See* BLM, Mining Claims and Sites on Federal Lands,  http://www.blm.gov/pgdata/etc/medialib/blm/wo/MINERALS__REALTY__AND_ RESOURCE_PROTECTION_/energy.Par.28664.File.dat/MiningClaims.pdf  (last  visited  Apr. 14, 2014).

For claims located after October 21, 1976, however, a claimant is required to file with the BLM "the official record of the notice of location or certificate of location," within ninety days of the initial location of a mining claim, but a claimant is not required to demonstrate that a "discovery" has been made at that point. *See* 43 U.S.C. § 1744(b). The issue of whether a discovery has been made arises in "controversies between rival claimants, each of whom claim the same ground by virtue of a mining location," and in disputes "between a mining claimant and the United States." ROCKY MTN. MIN. L. FOUND, 2 AMERICAN LAW OF MINING, §§ 35.10, 35-31–35-32 (2013). When such disputes arise between private parties, the court must decide whether a discovery has occurred. *Id.* at 35-32. In controversies between a claimant and the Government, however, Congress has authorized Interior to determine whether a claimant made a discovery of a valuable mineral deposit. *Id.* Judicial review of a Final Interior decision is authorized only by a United States District Court. *See Patterson v. United States*, 115 Ct. Cl. 348, 354–55 (1950) (holding that United States District Courts, not the Court of Claims, had jurisdiction under the Administrative Procedure Act to review Interior's determination that plaintiffs had not made a valid discovery of a mineral deposit). Interior's decision "on the question of discovery will be upheld on appeal unless it is arbitrary or capricious, or induced by fraud or imposition, or not supported by substantial evidence." ROCKY MTN. MIN. L. FOUND, 2 AMERICAN LAW OF MINING, § 35.10, 35-32 (2013); *see also Converse v. Udall*, 399 F.2d 616, 618 (9th Cir. 1968) (holding that a United States District Court has jurisdiction to review Interior's determinations under the Administrative Procedure Act).

When a mining claim is located on land withdrawn from mineral entry under Section 204(c) of FLPMA, to continue to mine notwithstanding the withdrawal, the claimant must prove discovery of a valuable mineral deposit, as of the time of withdrawal. *See Skaw v. United States*, 13 Cl. Ct. 7, 28 (1987) ("When land is closed to location under the mining laws subsequent to the location of a mining claim, the validity of the claim cannot be recognized unless the claim was supported by a valid discovery at the time of the withdrawal."), *aff'd* 847 F.2d 842 (Fed. Cir. 1988); *see also* 43 C.F.R. § 3809.100(a) ("After the date on which the lands are withdrawn from appropriation under the mining laws, BLM will not approve a plan of operations . . . until BLM has prepared a mineral examination report to determine whether the mining claim was valid before the withdrawal, and whether it remains valid.").

In this instance, the January 18, 2012 Withdrawal Order, issued pursuant to the Secretary of the Interior's authority under Section 204(c) of FLPMA, withdraws lands from the ambit of the Mining Law of 1872, but does not prohibit claimants from mining with "valid existing rights." *See* Withdrawal Order, 77 FED. REG. at 2,563 ("[T]his order withdraws approximately 1,006,545 acres of public and National Forest System lands from location and entry under the Mining Law of 1872, . . . *subject to valid existing rights*[.]" (emphasis added)); *see also Skaw*, 13 Cl. Ct. at 28 (holding that a claimant has valid existing rights when it made a discovery of a valuable mineral deposit, as of the time of the relevant withdrawal).

The BLM and Forest Service must conduct a valid existing rights determination ("VER determination") to ascertain whether a claimant has made a discovery of a valuable mineral deposit, thus endowing them with "valid existing rights" and excepting those claims from the moratorium imposed by the Withdrawal Order. *See Skaw*, 13 Cl. Ct. at 29 (explaining that if a

mining "claim is not valid at the time of withdrawal it is not excepted from the effect of the withdrawal").[6]

To obtain a VER determination under BLM regulations, a mining claimant must first submit a "plan of operations" for the proposed mining operation.  *See* 43 C.F.R. § 3809.100(a). BLM will not approve a plan of operations on withdrawn lands until BLM prepares a "mineral examination report" that determines "the mining claim was valid before the withdrawal . . . [and] remains valid."  *Id.*  And, as explained above, a valid mining claim requires a claimant to show it made a "discovery" of a valuable mineral deposit within the boundaries of the claim.  *See Hafen v. United States*, 30 Fed. Cl. 470, 473 (1994) (describing a mining claim on public lands as a "unique form of property . . . . [requiring a] discovery 'within the limits of the claim'" (quoting *Cameron v. United States*, 252 U.S. 450, 456 (1920))).  If the BLM determines that a mining claim is valid, the BLM will process the claimant's plan of mining operations to ensure it is consistent with the requirements of 43 C.F.R. § 3809.401.[7]  Thereafter, the BLM may require a claimant to provide "[o]perational and baseline environmental information for BLM to analyze potential environmental impacts as required by the National Environmental Policy Act[.]" *Id.* § 3809.401(c).

To obtain a VER determination under Forest Service regulations, a mining claimant must first submit a plan of operations for proposed mining operations, that includes: information about the mining operator; detailed maps showing the location of and access to the proposed mine; and "[i]nformation sufficient to describe or identify the type of operations proposed and how they will be conducted[.]"  36 C.F.R. § 228.4(c).  The Forest Service will not approve a plan of operations until it undertakes a VER "determination necessary to determine if [a mining claimant] had discovered a valuable mineral deposit[.]"  8/8/13 Schuppert Decl. ¶ 9; *see also* 36 C.F.R. § 228.41 (prohibiting the removal of mineral materials "from segregated or withdrawn lands," but noting that this provision does not "prohibit the exercise of valid existing rights").

---

[6] The relevant BLM internal policy document explains:

Holders of mining claims and sites located within lands later withdrawn from mineral entry must prove their right to continue to occupy and use the land for mining purposes.  The owner must demonstrate they contain a discovery of a valuable mineral deposit and/or are used and occupied properly under the General Mining Law, as of the date of withdrawal and as of the date of the mineral examination.  Mining claims or sites whose discovery or use or occupation cannot be demonstrated on the date of withdrawal or the date of mineral examination have no valid existing rights and will be contested by the Department.

BLM, Mining Law Administration, "Valid and Existing Rights Determinations."  *See* http://www.blm.gov/wo/st/en/info/regulations/mining_claims.html (last visited Apr. 14, 2014).

[7] This regulation requires a plan of operations that includes: detailed operator information; a description of operations; maps showing drill sites and mining activities; water management plans; a reclamation plan; a monitoring plan; and an interim management plan.  *See* 43 C.F.R. § 3809.401(b) (listing the information a "plan of operations must contain").

10

Unless the Forest Service has made a VER determination, it will not approve, modify, or deny a plan of operations. *See* 36 C.F.R 228.5(a)(1)–(5) (listing the actions the Forest Service must take after receiving a proposed plan of operations).

### E.      Issues Raised By The Government's August 20, 2013 Motion To Dismiss.

### 1.      Whether Plaintiff's Takings Claims Are Ripe For Adjudication.

### a.      The Government's Argument.

First, the Government argues that Plaintiff's inverse condemnation claims are not ripe for adjudication, because Plaintiff failed to follow the administrative procedures required by the BLM and Forest Service. Gov't Mot. 13. In particular, Plaintiff neither submitted a plan of operations nor obtained a BLM mineral examination report. 8/5/13 Cox Decl. ¶ 4–8. Nor has Plaintiff submitted a plan of operations to the Forest Service and consequently has not received a VER determination. 8/8/13 Schuppert Decl. ¶ 5. In fact, on May 7, 2010, Plaintiff specifically withdrew a previously proposed plan of operations submitted to the Forest Service, even though the Forest Service had scheduled a field visit to begin the VER determination process. 8/8/13 Schuppert Decl. ¶ 9. Since Plaintiff has complied with neither the BLM nor Forest Service procedures, neither agency has "made a preliminary or final decision that would bar [P]laintiff from using or that would take [P]laintiff's unpatented mining claims[.]" 8/8/13 Schuppert Decl. ¶ 5; *see also* 8/5/13 Cox. Decl. ¶ 4 (same).

Therefore, Plaintiff's failure to comply with the mandated procedures of both the BLM and Forest Service prevents the court from "determining if the [W]ithdrawal [O]rder has taken or will ever take [P]laintiff's unpatented mining claims." Gov't Mot. 13 ("The [W]ithdrawal [O]rder cannot take or prohibit [P]laintiff from using its unpatented mining claims unless BLM determines first that [P]laintiff does not have valid existing rights." (internal citation omitted)). In other words, because the plain language of the Withdrawal Order evidences that it does not prohibit mining on claims with valid existing rights, the court cannot determine what impact, if any, the Withdrawal Order has on Plaintiff's mining claims, unless and until Plaintiff receives a VER determination. Gov't Reply 1; *see also id.* ("If the [Government] decides that some or all of [Plaintiff's] claims are valid existing rights . . . , then the [W]ithdrawal [O]rder would not prohibit [Plaintiff] from mining[.]").

Moreover, because Plaintiff's takings claims must be analyzed under the three factors articulated by *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 124 (1978), Plaintiff's decision to avoid the required administrative procedures deprives the court of the "concrete facts" necessary to adjudicate Plaintiff's takings claims. Gov't Mot. 13 (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 618–19 (2001) (explaining that a federal trial court may not adjudicate an unripe takings claim under *Penn Central*, as that analysis "cannot be resolved in definitive terms until a court knows 'the extent of permitted development' on the land in question") (quoting *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 351 (1986))); *see also id.* 15 (citing *Stearns Co. v. United States*, 396 F.3d 1354, 1357–58 (Fed. Cir. 2005) (dismissing a takings claim of plaintiff's mining rights as unripe, where the agency retained authority under the Surface Mining Control and Reclamation Act of 1977, 30

U.S.C. §§ 1201–1328, to afford relief that was equivalent to "VER status"); *see also Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 191 (1985) (A takings claim "simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.")).   In short, it is impossible for the court to determine whether the Government "actually took" a property interest, unless and until Plaintiff avails itself of the administrative procedures at the BLM and Forest Service that Congress provided.  Gov't Mot. 9 (citing *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1212–13 (Fed. Cir. 2005) (explaining that, even where a property owner has a "valid property interest, the court [nevertheless also] must determine whether the governmental action at issue amounted to a compensable taking of that property interest") (quoting *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004))).

Second, the Government argues that Plaintiff cannot establish that the 678 unpatented mining claims at issue are protected property rights, since "[P]laintiff lacks the [VER] determinations under the Mining Law [of 1872] that would be necessary to establish that these claims are compensable property interests."  Gov't Mot. 15 (citing *Best*, 371 U.S. at 336–37 (holding that unpatented mining claims are only "valid against the United States if there has been a discovery of mineral within the limits of the claim")); *see also id.* 17 (citing *Hall v. United States*, 84 Fed. Cl. 463, 470–71 (2008) (explaining that a compensable property interest in unpatented mining claims requires a determination as to the validity of those claims) (internal citations and quotations omitted)).  To obtain a VER determination, the BLM and Forest Service "must conduct . . . mining claim validity examinations to determine if [P]laintiff has . . . discover[ed] 'valuable mineral deposits.'"  Gov't Reply 2 (quoting 30 U.S.C. § 22 ("[A]ll *valuable mineral deposits* in lands belonging to the United States . . . shall be free and open to exploration and purchase[.]" (emphasis added))).

Third, the Government argues that the United States District Court for the District of Arizona's decision in *Yount v. Salazar*, No. 3:11-cv-8171, 2013 WL 93372 (D. Ariz. Jan. 8, 2013), holding that challenges to the Withdrawal Order on various statutory and regulatory grounds are ripe for adjudication, does not have preclusive effect in this litigation.  Gov't Reply 4 (citing *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (holding that collateral estoppel did not apply where an issue decided in an earlier case was not identical to the issue in the pending case)).

### b.    Plaintiff's Response.

Plaintiff responds to the Government's ripeness argument in four ways.  First, Plaintiff does not dispute that it has not received a VER determination from the Forest Service or BLM.  Instead, Plaintiff responds that obtaining a VER determination is "unnecessary," since the Government "already acknowledged the existence of valuable mineral deposits under [Plaintiff's] claims."  Pl. Resp. 10.  On October 27, 2011, the BLM, in contemplation of the Withdrawal Order, issued a Final Environmental Impact Statement ("FEIS"), pursuant to NEPA, concluding that 60,638 tons of uranium oxide lies underneath the 3,350 mining claims located within the Withdrawal Area.  Pl. Resp. 10 (citing FEIS, B-26).  The methodology employed by the BLM in the FEIS demonstrates that 12,250 tons of uranium oxide lies under Plaintiff's

unpatented mining claims, and as such, the Government has "already made administrative findings that support the existence of valuable minerals and valid existing rights by [Plaintiff]." Pl. Resp. 11.[8]

Second, Plaintiff argues that this dispute is ripe for adjudication, because "an administrative decision has been formalized and its effects are felt [by Plaintiff] in a concrete way[.]" Pl. Resp. 7 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967) (holding that to determine whether an action is ripe for adjudication the court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration")). According to Plaintiff, the Withdrawal Order is a "final decision" that precludes Plaintiff from conducting exploratory drilling and from "demonstrating the existence of valuable minerals . . . [and] from developing and profiting from its claims." Pl. Resp. 8; *see also id.* ("[T]he [Government] has taken [Plaintiff's] mining claims specifically because it has taken [Plaintiff's] ability to explore those claims.").[9]

Third, Plaintiff asserts that the Government's ripeness argument has been rejected by the United States District Court for the District of Arizona in *Yount*, 2013 WL 93372, at *14, an action "based on the same facts as the present case" that challenges the Withdrawal Order under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* Pl. Resp. 9. In addition, the June 21, 2013 Complaint properly pleads the elements of a *per se* taking claim. As such, the court must accept, as true, Plaintiff's assertion that "it owns 678 valid mining claims" at this stage of the litigation, recognizing that additional proof will be necessary at trial; and that the validity of Plaintiff's claims is an element of this cause of action. Pl. Resp. 11–14 (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992) (holding that when a regulation forces the owner of real property to sacrifice all economically beneficial uses their property, they "ha[ve] suffered a taking")); *see also id.* 12 (construing the Government's ripeness arguments as an "improper[] demand[] that [Plaintiff] prove elements of its case as a prerequisite to bring[ing] this action").

Fourth, Plaintiff argues that there are two distinct standards used to evaluate mining claims. "The first, and more lenient standard, applies to the initial location, or 'staking,' of mining claims." Pl. Resp. 13. The prerequisite for the initial location of a mining is a "discovery . . . of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine." Pl. Resp. 13 (quoting *Best*, 371 U.S. at 335–36 (quoting *Castle*, 19 Pub. Lands Dec. at 457)). A claimant that made this initial "discovery" is entitled to stake the mining claim, and then explore and develop that claim. Pl. Resp. 13. The second and stricter standard, however, is necessary to obtain a "patent (or title)" to the land encompassed by the mining claim,

---

[8] Plaintiff further observes that a mineral examination of its 678 claims "will never happen." Pl. Resp. 11.

[9] In addition, undergoing a VER determination is "meaningless because it generally is not possible to demonstrate mineral discovery as mandated by the [Government] without exploratory drilling, and under the [W]ithdrawal [Order], the exploratory drilling is prohibited without a demonstrated mineral discovery." Pl. Resp. 8.

which requires a mining claimant to demonstrate that the claim is "valuable for minerals . . . or that there is a showing of sufficient valuable minerals to economically justify establishing a working mine." Pl. Resp. 13 (quoting *Best*, 371 U.S. at 336). Because Plaintiff's unpatented mining claims are centered on brecchia pipes, they are "likely to contain mineralization." Pl. Resp. 13–14. As such, Plaintiff does not need to comply with the BLM and Forest Service's regulatory scheme because the "the nature of such geologic formations is such that a prudent person would invest further labor and means to explore and confirm mineralization, thus satisfying the first standard[.]" Pl. Resp. 13. The Withdrawal Order, by contrast, impermissibly requires Plaintiff to satisfy the second, more stringent standard, amounting to a "regulatory change . . . [that] is an inappropriate standard to [gauge] the validity of a mining claim for the purposes of permitting mineral exploration." Pl. Resp. 14–15; *see also id.* 12 (explaining that the Withdrawal Order "creates a regulatory scheme for mining claims that previously did not exist, and which effectively destroys [Plaintiff's] ability to explore, develop and economically benefit from its mining claims").

### c. The Court's Resolution.

Foundational principles of ripeness and takings jurisprudence govern resolution of Plaintiff's takings claims. A "takings claim calls for a two-step analysis." *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000). First, the court must determine whether the claimant has established a compensable property interest. *See Hall*, 84 Fed. Cl. at 470; *see also Am. Pelagic Fishing Co.*, 379 F.3d at 1372. If, however, "the claimant fails to demonstrate the existence of a legally cognizable property interest, the [court's] task is at an end." *Am. Pelagic Fishing Co.*, 379 F.3d at 1372. Second, the court must determine "whether the character of the governmental action affected the claimant's 'bundle of property rights.'" *Hall*, 84 Fed. Cl. at 470 (quoting *Karuk Tribe*, 209 F.3d at 1374); *see also Chancellor Manor v. United States*, 331 F.3d 891, 902 (Fed. Cir. 2003) (same re: whether governmental action constitutes a compensable taking "for a public purpose"). The Fifth Amendment, however, does not create the property interests it protects. *See Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) ("Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972))).

To determine Plaintiff's property interest, the court is cognizant that unpatented mining claims are a unique form of property constituting a "possessory interest in land," where "the title to the land in controversy still belongs to the United States." *Hafen*, 30 Fed. Cl. at 473; *see also Best*, 371 U.S. at 336 ("Respondents' mining claims are unpatented, the title to the lands in controversy still being in the United States."). Nevertheless, unpatented mining claims are a protected property interest, "*if there has been a discovery* of mineral within the limits of the claim." *Best*, 371 at 336 (emphasis added); *see also Holden v. United States*, 38 Fed. Cl. 732, 735 (1997) ("To have a compensable interest in unpatented mining claims sufficient to bring a taking action in [the United States Court of Federal Claims], there must have been a determination as to the validity of those mining claims."); *Payne v. United States*, 31 Fed. Cl. 709, 711 (1994) ("[A] finding that an unpatented claim is valid against the United States . . . can only be made if there has been a discovery of [a] mineral within the limits of the claim." (internal quotations and citations omitted)); *Hafen*, 30 Fed. Cl. at 473 (same). No rights, however, attach

to an invalid claim.  *See Best*, 371 U.S. at 337 ("[N]o right arises from an invalid claim of any kind.").  Congress has authorized the Department of Interior to determine the validity of mining claims on the public lands.  *See Cameron*, 252 U.S. at 460 ("[T]he Secretary of the Interior . . . is charged with seeing that . . . valid claims may be recognized, invalid ones eliminated, and the rights of the public preserved."); *see also Payne*, 31 Fed. Cl. at 711 (holding that while normally the United States Court of Federal Claims is "to determine questions of ownership as an incident to determining a takings claim," Congress has given "Interior the power in the first instance to inquire into the validity of mining rights claimed against the Government"); *see also Hafen*, 30 Fed. Cl. at 473 ("The determination of the validity of claims against the public lands has been entrusted to the Department of the Interior since its creation in 1849.").  The established test to determine validity of a mining claim is that "it must be of such a character that 'a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine.'"  *Hafen*, 30 Fed. Cl. at 473 (quoting *Chrisman*, 197 U.S. at 322).

Ripeness is rooted both in constitutional and prudential considerations.  *See State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C. Cir. 1986), *cert. denied*, 480 U.S. 951 (1987) (explaining that ripeness is determined both by "the Article III requirement of a 'case or controversy' and prudential considerations favoring the orderly conduct of the administrative and judicial processes").  For these reasons, the United States Court of Appeals for the Federal Circuit has explained that "a claim that government regulation has taken the economic viability of a property 'is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'"  *Stearns*, 396 F.3d at 1358 (quoting *Williamson Cnty. Reg'l Planning Comm'n*, 473 U.S. at 186); *see also Washoe Cnty. v. United States*, 319 F.3d 1320, 1324 (Fed. Cir. 2003) ("Takings claims arising from the application of government regulations are not ripe until the government entity charged with implementing the regulation has reached a final decision.").  But, "a claimant must have first 'followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion' so that the extent of the restriction on property is known."  *Washoe Cnty.*, 319 F.3d at 1324 (quoting *Palazzolo*, 533 U.S. at 620–21).  In the realm of takings jurisprudence, ripeness is of paramount importance, because the court "cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes."  *MacDonald*, 477 U.S. at 348; *see also Mehaffy v. United States*, 98 Fed. Cl. 604, 612 (2011) (stating that finality, and therefore ripeness, "is compelled by the nature of the takings inquiry").

As a matter of law, without a VER determination from either the BLM or Forest Service, Plaintiff cannot establish, even at this preliminary procedural stage, that it possesses a protectable property interest in the 678 unpatented mining claims since "a compensable interest in unpatented mining claims [requires a] . . . determination as to the validity of those mining claims."  *Holden*, 38 Fed. Cl. at 735; s*ee also Best*, 371 U.S. at 336 (holding that unpatented mining claims are "valid against the United States *if* there has been a discovery of mineral within the limits of the claim" and explaining that such determinations are entrusted to the Department of the Interior (emphasis added)); *Payne*, 31 Fed. Cl. at 710–11 (same); *Hafen*, 30 Fed. Cl. at 473 (same).  Plaintiff is incorrect that a table in a October 27, 2011 Final Environmental Impact Statement estimating undiscovered uranium endowment in the Withdrawal Area is an "acknowledge[ment of] the existence of valuable mineral deposits under [Plaintiff's] claims."  Pl. Resp. 10.  That document does not circumvent the BLM's responsibility to make a

determination of the validity of unpatented mining claims. *See Holden*, 38 Fed. Cl. at 735; *see also Skaw*, 13 Cl. Ct. at 29 ("The function of the Government mineral examiner is . . . to verify . . . whether the claimant has, in fact, found a valuable mineral deposit.").

The absence of a compensable property interest has been recognized as grounds for dismissal under RCFC 12(b)(1) and 12(b)(6). *Compare Hafen*, 30 Fed. Cl. at 474 (dismissing takings claim premised on unpatented mining claims for lack of subject matter jurisdiction, because "plaintiff ha[d] no valid existing right" in the claims) *and Payne*, 31 Fed. Cl. at 712 (concluding that the absence of "an examination of the validity of the mining claims at issue" divested the court of jurisdiction and warranted a stay of proceedings), *with Holden*, 38 Fed. Cl. at 735–36 (concluding that the lack of a VER determination from the BLM did not divest the court of jurisdiction, but precluded plaintiffs from "stat[ing] a claim for relief under the Fifth Amendment") *and Ford v. United States*, 101 Fed. Cl. 234, 238 (2011) (explaining that plaintiff's failure to establish a valid property interest would warrant dismissal for failure to state a claim upon which relief can be granted). As the United States Court of Federal Claims has determined:

> Because the plaintiffs have never requested that the BLM determine the validity of their mining claims, their taking action does not rely on any determination that they have a compensable interest in the unpatented mining claims. Without a determination as to the validity of the plaintiffs' unpatented mining claims, those mining claims do not constitute a compensable property interest, and, therefore, the plaintiffs cannot recover in this [c]ourt under a taking theory.

*Holden*, 38 Fed. Cl. at 736.

In this case, Plaintiff failed to obtain a VER determination and consequently has no property right. Plaintiff therefore cannot show an entitlement to relief. *See Am. Pelagic Fishing Co.*, 379 F.3d at 1372 ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the [court's] task is at an end."); *see also Holden*, 38 Fed. Cl. at 736 (holding that an owner of unpatented lode mining claims who asserted the Government's "closure of lands on which [his] unpatented mining claims were located constituted a taking" did not state a claim for relief because the BLM had not made a determination as to the validity those claims).

Plaintiff's takings claims also must be dismissed, pursuant to RCFC 12(b)(1), because those claims are not ripe for adjudication. The Withdrawal Order explicitly provides that it does not impact claimants with valid existing rights. *See* Withdrawal Order, 77 FED. REG. at 2,563 ("This order withdraws approximately 1,006,545 acres of public and National Forest System lands from location and entry under the Mining Law of 1872, . . . *subject to valid existing rights*." (emphasis added)). Unless and until Plaintiff receives a VER determination, neither the BLM, the Forest Service, nor this court can determine if and how the Withdrawal Order will impact Plaintiff's unpatented mining claims. *See Stearns*, 396 F.3d at 1358 (A takings claim "'is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" (quoting *Williamson Cnty. Reg'l Planning Comm'n*, 473 U.S. at 186)). Before Plaintiff may bring a takings claim in the United States Court of Federal Claims, the BLM and Forest Service must be

given "the opportunity, using [their] own reasonable procedures, to decide and explain the reach of the challenged regulation." *Palazzolo*, 533 U.S. at 620; *see also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126 (1985) ("[T]he mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking."); *Stearns*, 396 F.3d at 1358 (holding that a takings claim was not ripe because the claimant had not pursued relief that was equivalent to a VER determination); *Benchmark Res. Corp. v. United States*, 74 Fed. Cl. 458, 463 (2006) ("A plaintiff is not entitled to seek judicial review before following the prescribed administrative procedures."). This is not a case where "the permissible uses of the property are known to a reasonable degree of certainty." *Palazzolo*, 533 U.S. at 620. Nor is this case one where the Government "has not identified any further administrative step available" to Plaintiff. *Washoe Cnty.*, 319 F.3d 1320. Instead, Plaintiff declined to follow a fundamentally reasonable and necessary procedure that will allow the BLM and Forest Service "'to exercise their full discretion' so that the extent of the restriction on property is known." *Washoe Cnty.*, 319 F.3d at 1324 (quoting *Palazzolo*, 533 U.S. at 620–21).

Plaintiff's remaining arguments against dismissal also lack merit. As an initial matter, the court is not obligated to accept the factual averments in the June 21, 2013 Complaint when ascertaining whether this dispute is ripe for adjudication. *See Reynolds*, 846 F.2d at 747 ("If a motion to dismiss for lack of subject matter jurisdiction . . . challenges the truth of the jurisdictional facts alleged in the complaint, the [trial] court may consider relevant evidence in order to resolve the factual dispute."). Further, the fact that Plaintiff's unpatented mining claims are centered on breccia pipes that are "likely to contain mineralization" does not excuse Plaintiff from compliance with the VER determination process, since "Congress has given the Department of Interior the power in the first instance to inquire into the validity of mining rights claimed against the Government." *Payne*, 31 Fed. Cl. at 711. Although Plaintiff invokes *Abbott Laboratories*, that case held that ripeness must be discerned by evaluating "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149. In this case, analysis of Plaintiff's takings claim involves highly factual determinations where "further administrative proceedings are contemplated," as opposed to the kind of "purely legal" issues that *Abbott* held were sufficiently ripe for adjudication. *Id.* This case also invokes *Abbott's* warning that ripeness is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies . . . [and from interfering with agency decision making] until an administrative decision has been formalized[.]" *Id.* at 148.

Although Plaintiff cites to the court's determination in *Yount* that a challenge to the Withdrawal Order under the APA was ripe for adjudication, that decision has no preclusive effect here. For collateral estoppel to apply, the issue in this case must be "identical to [the issue] decided in the first action." *Laguna Hermosa Corp.*, 671 F.3d at 1288. The District Court found that challenges to the Withdrawal Order on statutory and regulatory grounds were ripe for adjudication. *See Yount*, 2013 WL 93372, at *14. That determination, however, is wholly distinct from one that Plaintiff's takings claims under the Fifth Amendment are ripe for adjudication. *See Laguna Hermosa Corp.*, 671 F.3d at 1288 (holding that issues were not identical for purposes of issue preclusion because in one case, the court was required to interpret a particular statutory word, whereas in the other, that analysis was unnecessary); *see also In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994) ("[A]pplication of issue preclusion centers around whether an issue of law or fact has been previously litigated.").

Finally, while Plaintiff decries the January 18, 2012 Withdrawal Order as imposing a new and materially different regulatory scheme, the requirement to obtain a VER determination on lands that are withdrawn from appropriation under the Mining Law of 1872 is of relatively longstanding nature. As an initial matter, the BLM published a Final Rule formally imposing this requirement on November 21, 2000, over eleven years prior to the Withdrawal Order. *See* Mining Claims Under the General Mining Laws; Surface Management, 65 FED. REG. at 70,025 (promulgating the BLM Final Rule requiring mining operators to obtain a VER determination prior to receiving approval for a plan of operations on withdrawn or segregated lands). Furthermore, as comments accompanying the November 21, 2000 Final Rule demonstrate, both the Forest Service and BLM had imposed this same requirement, as a matter of policy, prior to November 21, 2000. *Id.* at 70,026 (explaining that, even though "[b]oth the Forest Service and BLM already generally do, as a matter of policy, require VER examinations when operations are proposed on lands that have been withdrawn or segregated," the BLM "believes that this policy should be embodied in regulations so that *all affected interests are fully aware of it, and to assure that mining operations don't proceed in segregated or withdrawn areas unless valid existing rights are present.*" (emphasis added)). As an experienced mining operator, Plaintiff was or should have been aware of this requirement.

For these reasons, the court has determined that Plaintiff's takings claims must be dismissed, without prejudice.

### 2. Whether The Court Has Jurisdiction To Adjudicate Plaintiff's Estoppel Claim.

#### a. The Government's Argument.

The Government posits several reasons for why the court also does not have jurisdiction to adjudicate Plaintiff's "estoppel" cause of action. First, to establish jurisdiction under the Tucker Act, Plaintiff must establish a "federal law, regulation, [constitutional provision], or contract that 'mandat[es] compensation' by the United States for 'money damages[.]'" Gov't Mot. 18 (quoting *Mitchell*, 463 U.S. at 216–17; *see also Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1306–07 (Fed. Cir. 2008) (holding that jurisdiction under the Tucker Act requires a "money-mandating" source of federal law creating a right to "money damages against the United States")). Since the June 21, 2013 Complaint does not incorporate or reference any federal law, regulation, or contract requiring the Government to pay money damages for refusing to allow Plaintiff to mine on federal lands subject to the Withdrawal Order, the court does not have jurisdiction over Plaintiff's estoppel cause of action. Gov't Mot. 18.

Second, even if Plaintiff properly pled a money-mandating provision of federal law in the Complaint, estoppel may not be asserted against the Government "where, as here, [P]laintiff requests monetary damages but (1) does not adduce a written contract prohibiting the alleged federal misconduct allegedly causing these damages, on which [P]laintiff allegedly relied and (2) alleges damages from federal actions that, if they occurred, would violate federal law." Gov't Mot. 18–19 (citing *Frazer v. United States*, 288 F.3d 1347, 1352–53 (Fed. Cir. 2002) (explaining that the doctrine of equitable estoppel is not available in suits seeking money damages from the Government "where payment would contravene a statutory appropriation") (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 423–24 (1990)); *see also Burnside–Ott Aviation*

*Training Ctr., Inc. v. United States*, 985 F.2d 1574, 1581 (Fed. Cir. 1993) (observing that equitable estoppel may be available against the Government where a plaintiff's claim is based on a purported breach of contract)).  Plaintiff has not shown, however, any written contract requiring the BLM or Forest Service to approve Plaintiff's uranium mining. Gov't Mot. 19.  In addition, without an approved plan of operations and a VER determination, it would be illegal for Plaintiff to mine within the Withdrawal Area, and thus application of equitable estoppel would result in actions that are "unauthorized under federal law." Gov't Mot. 19.

Third, Plaintiff's estoppel cause of action, like the takings claims, is not ripe for adjudication. Gov't Mot. 19 (citing *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal citations and quotations omitted))).

Fourth, to the extent that the Complaint alleges an implied-in-fact contract cause of action, the court does not have jurisdiction to adjudicate that claim for similar reasons.[10] Plaintiff's implied-in-fact contract theory does not rest on a federal law or contract that mandates compensation by the Government. Gov't Reply 15.  Moreover, none of the sources Plaintiff cited in order to buttress the implied-in-fact contract theory authorize Plaintiff to conduct mining activities within the Withdrawal Area or "include[] a promise to pay [P]laintiff money if the [Government] ever prohibits [Plaintiff] from doing so." Gov't Reply 15.  Likewise, Plaintiff is required to "link the 'course of conduct' on which it supposedly relied to an actual contract" authorizing Plaintiff to mine within the Withdrawal Area. Gov't Reply 15; *see also id.* 16 (stating that Plaintiff's theory requires it to link "the federal representations which it claims to have relied [on] to an actual contract allowing the particular mining activities that [P]laintiff desires").  But, Plaintiff has failed to plead the requirements for an implied-in-fact contract, which must allege "the same elements as an express contract." Gov't Reply 15 (quoting *Peninsula Group Capital Corp. v. United States*, 93 Fed. Cl. 720, 731 (2010); *see also Sinclair v. United States*, 56 Fed. Cl. 270, 277–78 (2003) (listing the requirements for an implied-in-fact contract as "consideration, lack of ambiguity in offer and acceptance, mutuality of intent to contract, and actual authority on the part of the agency representative to bind the Government")).  Because Plaintiff's implied-in-fact contract theory relies on unidentified language in Section 304 of the AWA, mutuality of intent and consideration are lacking.  Gov't Reply 15–16.

### b.   Plaintiff's Response.

Plaintiff responds that the Complaint properly pled a "[p]romissory [e]stoppel [c]laim," based on the congressional determination in Section 304 of the AWA that the lands within the Withdrawal Area are "eligible for mineral exploration" and therefore ineligible for withdrawal. Pl. Resp. 15.  In addition, the Government collected and continues to collect mining claim maintenance fees from Plaintiff and other claimants with mining claims in the Withdrawal Area.

---

[10]  In the September 20, 2013 Response, Plaintiff attempts to recast the estoppel cause of action in terms of an implied-in-fact contract.  Pl. Resp. 15–16 (explaining that the Government's conduct "is sufficient to form the basis for an implied-in-fact contractual obligation to leave the lands available for mineral exploration").

Pl. Resp. 15. This "conduct is sufficient to form the basis for an implied-in-fact contractual obligation to leave the lands available for mineral exploration." Pl. Resp. 15–16 (citing *Toon v. United States*, 96 Fed. Cl. 288, 299 (2010) (explaining that Tucker Act jurisdiction extends to implied-in-fact contracts, but that a "plaintiff must allege all the requisite elements of a contract with the United States")).

Plaintiff also contends that equitable estoppel may be asserted against the Government where the claim is based on a breach of contract, but that there is no requirement "that the contract be in writing." Pl. Resp. 16. Plaintiff also reasons that the estoppel claim is ripe for adjudication, because the Withdrawal Order is a final agency decision and "mineral examinations . . . will not change the existence or extent of [Plaintiff's] harm." Pl. Resp. 16–17.

### c.    The Court's Resolution.

Plaintiff's estoppel claim is both ambiguous and inconsistently articulated. For example, it is referred to as: (1) estoppel (Compl. 18); (2) promissory estoppel (Compl. ¶ 3); (3) equitable estoppel (Compl. ¶ 69); and (4) and an implied-in-fact contract (Pl. Resp. 15–16).

Although the Complaint refers to the generalized concept of estoppel, that term, standing alone, is ill-defined and nebulous. *See* RESTATEMENT (SECOND) OF CONTRACTS § 90 ("Estoppel prevents a person from showing the truth contrary to a representation of fact made by him after another has relied on the representation."). Black's Law Dictionary defines estoppel, generally, as:

> A bar that prevents one from asserting a claim or right that contradicts what one has said or done before or what has been legally established as true. 2. A bar that prevents the relitigation of issues. 3. An affirmative defense alleging good-faith reliance on a misleading representation and an injury or detrimental change in position resulting from that reliance.

BLACK'S LAW DICTIONARY 589–90 (8th ed. 2004).

These characterizations, however, are merely generic definitions for various iterations of estoppel (*i.e.*, promissory estoppel, collateral estoppel, and equitable estoppel), as evidenced by the fact that Black's Law Dictionary provides specific definitions for upwards of twenty-five types of estoppel immediately thereafter. *Id.* Thus, while the Complaint generally alleges an estoppel claim, the gravamen of Plaintiff's second cause of action is either: promissory estoppel, equitable estoppel, or breach of an implied-in-fact contract.

To the extent that Plaintiff's claim is one for promissory estoppel, the United States Court of Federal Claims does not have jurisdiction to adjudicate that claim, because promissory estoppel "requires the court [to] find an implied-in-law contract, a claim for which the United States has not waived its sovereign immunity." *Steinberg v. United States*, 90 Fed. Cl. 435, 443 (2009); *see also Hercules, Inc. v. United States*, 516 U.S. 417, 423 (1996) ("[J]urisdiction [under the Tucker Act] extends only to contracts either express or implied in fact, and not to claims on contracts implied in law."); *Carter v. United States*, 98 Fed. Cl. 632, 639 (2011) ("This court has

no jurisdiction to hear a claim for promissory estoppel, and to the extent plaintiff substantively asserts the elements for promissory estoppel, dismissal for lack of jurisdiction under 12(b)(1) is appropriate." (internal citation omitted)); *Hubbs v. United States*, 20 Cl. Ct. 423, 427 (1990) (noting that "[p]romissory estoppel is another name for an implied-in-law contract claim").

To the extent that Plaintiff claims an implied-in-fact contract arose from Section 304 of the AWA, an unidentified 2008 Resource Management Plan "that classified the lands [within the Withdrawal Area] as eligible for mineral exploration," together with the Government's collection of maintenance fees, these contentions fall far short of a well-pled allegation of an implied-in-fact contract sufficient for this court to exercise jurisdiction.   Section 304 of the AWA provides:

> The Congress hereby finds and directs that lands in the Arizona Strip District of the Bureau of Land Management, Arizona, and those portions of the Starvation Point Wilderness Study Area (UT–040–057) and Paria Canyon Instant Study Area and contiguous Utah units in the Cedar City District of the Bureau of Land Management, Utah, not designated as wilderness by this Act have been adequately studied for wilderness designation pursuant to section 603 of the Federal Land Policy and Management Act (Public Law 94–579) and are no longer subject to the requirement of section 603(c) of the Federal Land Policy and Management Act pertaining to the management of wilderness study areas in a manner that does not impair the suitability of such areas for preservation as wilderness.

AWA, Pub. L. 98-406, 98 Stat. 1485 § 304.

The Tucker Act authorizes the United States Court of Federal Claims to "render judgment upon . . . any express or implied contract with the United States[.]"   28 U.S.C. § 1491(a)(1).   But "jurisdiction under this provision requires . . . a non-frivolous *allegation* of a contract with the [G]overnment." *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011) (emphasis in original).   In contrast, an implied-in-fact contract "requires proof of (1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the government's representative to bind the government in contract." *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012) (quoting *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003)).

Plaintiff's citation to Section 304 of the AWA is not an explicit promise to maintain the Withdrawal Area for mineral extraction, nor constitutes an offer, as it does not reflect the "manifestation of willingness [on the part of the Government] to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." RESTATEMENT (SECOND) OF CONTRACTS § 24.   Nor does the Complaint sufficiently allege consideration "in the form of a bargained-for exchange . . . that the promisee's expectation of performance is reasonable, and not disingenuous reliance on the words of a non-serious and unwilling promisor." *Howell v. United States*, 51 Fed. Cl. 516, 521 (2002).

Assuming, *arguendo*, that payment of fees to the Government may give rise to an implied-in-fact contract, the court also does not have jurisdiction to adjudicate that claim because

Plaintiff has not asserted or otherwise demonstrated that this implied-in-fact contract "could fairly be interpreted as contemplating money damages for [its] breach." *Holmes v. United States*, 657 F.3d 1303, 1315 (Fed. Cir. 2011) (holding that it "was proper for the [United States Court of Federal Claims] to require a demonstration that the agreements [allegedly breached by the Government] could fairly be interpreted as contemplating money damages in the event of breach"). Plaintiff's implied-in-fact contract claim rests solely on an assumption that the Government had an obligation to keep the lands within the Withdrawal Area open for mining exploration and location, and that the Withdrawal Order breached that implied contractual obligation. Pl. Resp. 15–16. Even if an implied contractual obligation of that nature existed, Plaintiff has not alleged sufficient facts to suggest that the breach of this obligation could reasonably be interpreted to contemplate monetary damages.

Moreover, any claim for breach of an implied-in-fact contract is insufficiently pled under RCFC 8. *See* RCFC 8(a)(2) (requiring a "short and plain statement of the claim, showing that the pleader is entitled to relief"); *see also Iqbal*, 556 U.S. at 679–80 (holding that facts suggesting the "mere possibility of misconduct" do not "nudg[e] . . . [a plaintiff's claim] across the line from conceivable to plausible," and are therefore insufficient to withstand a Rule 12(b)(6) motion to dismiss). The allegations at issue here demonstrate only that *if* the Government makes a future negative VER determination, it *may* prohibit Plaintiff from mining, and that the Government *might* be obligated to compensate Plaintiff monetarily. Such allegations do not allow the court to draw "the reasonable inference that the [Government] is liable" for breach of an implied-in-fact contract. *Id.* at 678.

To the extent that the Complaint alleges equitable estoppel, the United States Court of Appeals for the Federal Circuit has held that "equitable estoppel *is not necessarily unavailable as a matter of law* where the plaintiff's claim is based upon an alleged breach of contract." *Frazer*, 288 F.3d at 1353 (emphasis added). As discussed above, however, Plaintiff inadequately pled the existence of a contract, and, even if an implied-in-fact contract existed, the court would not have jurisdiction over that claim. *Id.*

Further, "if equitable estoppel is available at all against the [G]overnment, some form of affirmative misconduct must be shown in addition to the traditional requirements of estoppel." *Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2000) (collecting cases and explaining that every court of appeals, including the United States Court of Appeals for the Federal Circuit, has "held that affirmative misconduct is a prerequisite for invoking equitable estoppel against the [G]overnment"). Interior's promulgation of the Withdrawal Order was designed to protect the Grand Canyon Watershed from the adverse effects of locatable mineral exploration and development, and does not reflect Government misconduct. *See Henry v. United States*, 870 F.2d 634, 637 (Fed. Cir. 1989) (holding that IRS procedures, although "cumbersome and inefficient," coupled with representations that did not have the effect of misleading the plaintiff on the specific question at issue, did not constitute affirmative misconduct); *see also Hanson v. Office of Pers. Mgmt.*, 833 F.2d 1568, 1569 (Fed. Cir. 1987) (holding that Government officials' incorrect advice that "receipt of the lump-sum [workers' compensation] benefit would not prevent [plaintiff] from receiving a civil service retirement annuity," when in fact it did, was not affirmative misconduct because Government officials acted in good faith).

For these reasons, Plaintiff's estoppel cause of action also must be dismissed.

## III.  CONCLUSION.

For these reasons, the Government's August 20, 2013 Motion To Dismiss is granted. Accordingly, the Clerk of Court is directed to dismiss the June 21, 2013 Complaint.

**IT IS SO ORDERED.**

/s_____
**SUSAN G. BRADEN**
**Judge**